And whenever you're ready, Mr. Hudson, we'll hear from you. Good morning, and may it please the Court. Several issues were raised in the briefs, but in light of the time, I'd like to begin with the violation of Mr. Bell's Miranda rights and then explain why Maryland robbery does not qualify as a violent felony under the Armed Career Criminal Act. Turning further to the Miranda issue, the question before this panel is whether the government can, in executing the warrant for drugs and firearms, secure a house with a SWAT team, seat the married occupants handcuffed immediately next to each other, fail to Mirandize them, ask without any spoken indication of the addressee whether there are firearms in the house, and then claim after the fact that the question was directed and whomever did not respond. The answer to this question has to be no. Miranda cannot be so easily circumvented. Under Rhode Island v. Innis, Agent Oliver's question, whether there are firearms in the house, is something that the police should have known is reasonably likely to elicit an incriminating response. It's important to note, Your Honors, that the government concedes that Mr. Bell was in custody and that he was not Mirandized. And the government gives two reasons why Mr. Bell's statements were nevertheless admissible, and neither reason is persuasive. The government first argues that Mr. Bell was not subject to a custodial interrogation, and the government agrees that the relevant standard is that articulated in Rhode Island v. Innis, whether Agent Oliver should have known that his question was reasonably likely to elicit an incriminating response. And there are a couple items that I think make it very clear that his question was reasonably likely to elicit an incriminating response. First, Agent Oliver was executing a warrant for drugs and firearms against Mr. Bell. Two, Mr. and Mrs. Bell, a married couple, were seated immediately adjacent to one another. Agent Oliver, after the SWAT team has come through the house, Agent Oliver walks in, he says, I'm executing a narcotics search warrant, and then he asks, are there any weapons in the house? And it's impossible to say that that question, in that context, was not reasonably likely to elicit an incriminating response. Does this make any difference that Agent Oliver, and let's presume he knew what he was doing, said, I'm going to speak to the woman in the house because she is not under our investigation. We're searching with respect to Mr. Bell, and asking her in particular, do you have any guns in the house? How about he pulled her off in the kitchen and said that? Could he have done that? Absolutely, Your Honor. Now, he says he did that, he was just talking to her, and was looking directly at her a couple of feet away, and she was looking at him, and said, I was asking her, and Mr. Bell pipes in. And the district court credited that and made that as a factual finding. What does that do to your argument? That's right, Your Honor, but Agent Oliver's subjective intention is irrelevant under the Innis standard, which is subjective and asks whether the officer He said he stood a few feet from her, looked in her eyes, and she looked in his eyes, and he was speaking to her. And he was asking her, are there any guns? Now, if that's a factual finding, and Mr. Bell volunteers to answer that question. That is a factual finding, Your Honor, and the government attempts to characterize this court's review as for clear error, but that's simply foreclosed by this court's decision in Giddens, where this court said that the legal question of whether Miranda applies Well, we take the facts on a clear error stand. Then we determine whether those facts constitute a constitutional violation. But you have to accept those facts unless you're prepared to say the court was in error in finding those facts. And, Your Honor, we accept the truth of Agent Oliver's testimony and don't question that. But given those facts, it is nevertheless clear that his conduct was reasonably likely to elicit an incriminating response. Was the wife handcuffed? She was handcuffed too? Yes, Your Honor. And how far was she from the defendant? They were immediately adjacent to each other. They were sitting in two chairs. The chairs are right beside each other? Correct. And both of them are handcuffed? Yes, Your Honor. This is his wife. They all stay in the house, and the officer just chooses to just look at the wife and says, You have guns in the house? That is exactly correct, Your Honor. Did he say any other prefatory statement? Because you are here, this is your house, and we want to just make sure. Or he just went straight to that statement? Your Honor, Agent Oliver's testimony is that he announced that he was executing a narcotics warrant, and then asked, Are there any weapons in the house? That's it. There was no spoken indication, no prefatory statement about, Mrs. Bell, I'm asking this question to you, nothing of the kind. The warrant, was it directed to the wife in any way, or was it directed to both, or just to the house? How was it? No, Your Honor. The warrant was directed specifically against Mr. Bell. The allegation was that Mr. Bell possessed drugs and firearms. What would be the basis for handcuffing Mrs. Bell? Was that safety? Yes, Your Honor. Agent Oliver testified that the SWAT team, the emergency services team, entered the house, secured all of the occupants as per the normal protocol. So simply because Mrs. Bell was an occupant of the house, she was handcuffed and detained under normal procedures. And it's easy, I think, to imagine, Your Honor, that you have a married couple, two spouses sitting next to each other, and without any verbal indication, prefatory statement about who the question was directed towards, an officer asks the question. And I think anyone who's married. Just out of curiosity, was she a big woman or a small woman? I mean, what size was she relative to what was going on in her husband's? I'm just curious, because I think this is an interesting scenario. You take a man's wife, you put him right beside her, and it's just an inclination scene to me, and I don't want to give the bail perspective too much, but someone, was he, did he yell? Or did he just look straight at her? Because she's not under investigation by anybody. And asked this question in front of the husband, and, I mean, he has to know the husband's sitting there. I'm trying to figure this out. That's exactly right, Your Honor. Agent Oliver knows that Mr. Bell is sitting there, and there's no testimony in the record that he was afraid of Mrs. Bell or there was any particular reason why he asked her versus Mr. Bell. And anyone who's married understands that it's reasonably likely that if you ask a member of a married couple a question, it's reasonably likely that the spouse might respond. What was her reaction? Did she appear to be afraid or nervous? Or was there any of that in the record? Mrs. Bell's testimony at trial, so not in the motion hearing. She testified that she was afraid when the SWAT team came in, but there's no testimony regarding her demeanor at the time. I'm just trying to think of a different scenario if you have a husband and a wife, and the wife is there crying and falling all apart, and the officer goes up and speaks to her, right, the husband, about something she's not even involved in. It just demands that the husband says something if he's going to be a man about it, I guess. I don't know. Absolutely, Your Honor, and this is not a situation where the officer is coming in and then giving an explanation of what's going on, and then somebody pops up. This is a question directly asking about the object of the warrant, firearms. Are there any weapons in the house? And asking that question in that context, seated right next to his wife, it's reasonably likely that that question is going to elicit an incriminating response from the suspect. Do you regard the fact that this officer might have been appealing to Mr. Bell's conscience, given that his wife was being interrogated? Your Honor, I think that's entirely possible, but I don't think that's necessary. This Court doesn't need to conclude that. It's simply sufficient to say that given the context, given the fact that the warrant was being executed against Mr. Bell, the fact that they were sitting immediately next to each other, there was no prefatory statements, asking are there any weapons in the house, it's reasonably likely that Mr. Bell will respond with an incriminating response. But in a different time period, this might be different, but what if it's a child? I mean, what if it's a 10-year-old or 12-year-old child of the father? The father's sitting there, asked his child, and I know women aren't putting that pain in him that way, but still, that is there. I'm just trying to understand the rationale for the way this is going. I'm sure we'll hear from the other side. Yes, Your Honor. I'd like to remind the Court that in Kelowna, this Court said that it is not going to provide law enforcement a complete end run around Miranda. And if we accept the government's case here, that the government can simply seat two people next to one another, ask a question that's not verbally addressed to either of them. Is it just people or does it matter that it's his wife? It is particularly important that it's his wife. It makes it that much more likely that asking a question is going to elicit an incriminating response. I mean, if it's one of his buddies who's sitting in the chair, it sounds like to me your argument could be as strong, but if you're going to tie it just to proximity and the fact he's asking and sitting right there, but does relationship play into this? Relationship undoubtedly plays into this, Your Honor, because when they're a married couple, it's much more likely that a question directed to either of them could be answered by either of them. And so even if you accept Agent Oliver's testimony that the question, that Agent Oliver was looking at Mrs. Bell in the eye, asking Mrs. Bell a question, it's reasonably likely that her husband is going to respond. And the opposite would be true as well. But, again, it's important to note that there's nothing in the – in fact, Agent Oliver testified that he didn't introduce his statement with any prefatory material addressing it specifically to Mrs. Bell. All we have is a look. And a look is simply insufficient to say that it was not reasonably likely to elicit an incriminating response here. If I could turn to the second argument that the government makes in response on the Ramiran issue, the government argues that even putting aside the custodial interrogation, that the public safety exception of quarrels applies here. And this argument is squarely foreclosed by this Court's decision in Mobley. Mobley has an almost identical scenario involving the execution of a warrant, and a SWAT team comes in, secures the premises. So even if we agree with you to some, any extent, that the statement should have been suppressed, what gets suppressed? Mr. Bell, all of Mr. Bell's statements regarding the firearm, his statement that that is, that there was a firearm underneath the couch, and his statements regarding the fact that it was his and was given to him by a neighbor after their house had been burned. What about the drugs? The drugs would not be suppressed, Your Honor, although we believe that – What about the gun upstairs? The gun upstairs, Your Honor? Yeah. When they searched the house, didn't they find another gun, ammunition, and documents with his name on them? Yes, Your Honor. That evidence would come in, but there are two crucial points here. Number one – Let me make sure what I'm saying is saying. Evidence of the gun upstairs come in along with the bullet, the ammunition. Yes, Your Honor. Just the gun in the closet or wherever it was is the only thing that would be suppressed. And crucially, his testimony, his testimony regarding that gun would be suppressed, and that's crucial. That puts ownership with him. Yes, Your Honor. Yes, Your Honor, and there are two crucial points. One, the government has not made any harmless error argument regarding the suppression of the firearm, and the government consistently connected the firearm with the drug offenses. The government consistently argued that firearms are tools of the drug trade, and therefore the fact that Mr. Bell possessed a firearm made it more likely that he also possessed the guns in the basement. So these two pieces of evidence are intimately connected and cannot be separated, not to mention the fact that the government didn't make the argument at all, and so therefore it's waived. If I could turn briefly to the Maryland robbery issue, the Armed Criminal Act issue. As Your Honors know, the Armed Criminal Act, in order to qualify as a violent felony under the Force Clause, Maryland robbery, the crime of conviction in 1985, must have had as an element the use, attempted use, or threatened use of physical force against the person of another. There are two Maryland cases that address the question whether Maryland robbery can be committed with the threat or use of force against property. Both of those cases, Giles and Douglas, say it can. That should end this Court's analysis, period. This Court doesn't have to do anything else. The government gives two arguments why this Court should dismiss those two Maryland cases, and neither of them are persuasive and are both foreclosed by this Court's precedence. First, the government argues that Giles and Douglas were decisions issued by intermediate appellate courts, and that simply is irrelevant. This Court routinely looks at the decisions of intermediate appellate courts in resolving Armed Criminal Act issues. This Court did that in Winston, citing Virginia-Maryland appellate court cases, Maxwell and Jones. This Court did it in Gardner, citing North Carolina appellate court cases, Chance and Eldridge. And this Court did it in King, citing Inres Spencer R., a South Carolina intermediate appellate court case. The government makes a second argument that Giles and Douglas should be discarded because the key language is part of the reasoning of the opinion and not its holding. But this Court, sitting on Bach and Apparicio-Soraya, explicitly, in footnote 4, rejects that position. And, of course, that position has to be rejected. If this Court could only attend to the holdings of state court cases, it would make the Armed Career Criminal Act analysis fundamentally interminable and insoluble. And so the fact of the matter is there are two key cases, Giles and Douglas, that address this question. They have never been rejected by any subsequent Maryland case. That ends the question, Your Honors. So this Court should vacate Mr. Bell's conviction, and in the event it does not do so, it should vacate his sentence for resentencing. All right, thank you. Thank you. Mr. Packard. May it please the Court. Good day. Michael Packard on behalf of the government. We're here today because the defendant, Quentin Antonio Bell, was found guilty of all charges levied against him after a six-day trial by a jury of his peers. Thereafter, he was sentenced to the mandatory minimum sentence possible under law, based upon the statutes of conviction and his lengthy criminal history. The defendant here has challenged both his conviction and his sentence on several grounds. None of the arguments have merit. This jury's verdict must stand, and that sentence, which is in line with clear binding precedent, ought to be upheld as well. I'll begin, as defense counsel did, with the question of whether the defendant's statements during the April search ought to be admissible. Judge Haslip denied that motion on two bases. We've heard about them, that there was no interrogation first and foremost, and as a fallback that the public safety exception applies. Let's begin with the question of whether there was any interrogation. Even if a suspect is in custody, and yes, Mr. Bell was handcuffed. He was in custody. Does it matter that the wife was the one who was being interrogated immediately beside the husband, and that she was not the subject of this investigation, but was simply being detained because that was procedures? I think, Your Honor, I'll say two things. In terms of the underlying facts about where individuals were and what exactly was said to whom and how, let's be clear that Judge Haslip credited every single statement made by Agent Oliver. Therefore, all of his testimony constitutes the factual findings, all subject to very differential clear error. What different did he say than what I just said to you? So I think what he agreed to is that they were in close proximity. We have two separate chairs. They're not on the couch holding hands next to each other, shoulders touching. We have two separate chairs. They're in the same room? They are in the same room, absolutely. Close proximity to each other? Yes, Your Honor. My question is, does it make a difference to the husband and wife? I don't think, Your Honor, that it does. Would it make a difference if it was his grandmother? No, Your Honor. How about if it was his child? Then we might have a different question because we're talking about a minor, and I think that this court, and I can't give you a pin site to it, but I think that there are a variety of circumstances in which a variety of courts have recognized that situations involving juveniles may be different. And I suppose it would be true if you had a mentally incompetent child? I think that, too. How about if grandma is just old and seemed to be a little gullible? I think if – I wouldn't want to be – to look askance at senior citizens and think that they don't have the ability to make fully informed choices. What if the wife is particularly nervous and crying and just seems to be just completely distraught in front of the husband sitting next to her? Does that make a difference? If those were the facts, those could fall into the totality of circumstances because that's what the court has to look at. Was there anything that prohibited the officer from arandozing the defendant and asking him those questions? Nothing prohibited him from doing so, although, as Mr. – He just made a choice to speak to the wife who's in close proximity to the defendant under a circumstance where the SWAT team is all through the house and he just looks at the wife right there with the defendant looking at him and makes that decision. Do we have any indication how loud he was speaking to her? Agent Oliver testified that he entered, saw Mrs. Bell sitting already, Mr. Bell being brought from – I mean, this is not a courtesy visit. He's handcuffed to a seat. So she obviously recognized that she's in a situation where, if it's not a threat, it certainly feels like it's not a comfortable situation, clearly not your friend. So it's not a friendly conversation at all. It's being directed right at the wife of the defendant who's sitting right next to him. Well, I think, Your Honor, it's important to know – Or at least in close proximity. Exactly what Agent Oliver said. He entered, saw her, introduced himself to her, explained to her there was a search warrant for her home. He knew she was the homeowner. And he actually testified also, and there wasn't a great detail, that there was an agreement not to question Mr. Bell. There was an agreement with whom? That was not specified, so I don't want to speak outside the record. There was an agreement not to question Mr. Bell. So he knew he couldn't talk to the husband. So he asked the homeowner for officer safety. That, too, is a statement credited by the court. His motivation – It was a statement made to the defendant before you asked her that – Zero statements. Well, you don't have to talk because we haven't given you a Miranda, but I'm asking your wife only, or just said it to the wife right in front of you. He introduced himself to the homeowner, looked her in the eye, told her they were there to execute a warrant, and asked her for officer safety, whether there were any weapons in the house that could hurt an officer. That's the testimony. With both of them handcuffed, how are they going to hurt the officers with weapons in the house? I think, Your Honor, we don't know whether they're – at that point, we can't be completely certain whether there might not be other folks there. Why not ask that question? Well, I think, Your Honor, we didn't get to that question. But that would seem to be a logical question to start with. Is there anybody else in this house? Because you don't need a gun to hurt someone if someone else is in the house. It could go a variety of ways. I think, Your Honor, the point that we'd like the court to focus on is that – I know what you want me to focus on, but I want to answer that question. Why wouldn't you start out – if you think you've got a safety problem because of guns in the house, the gun is being said all over the country now. Guns don't kill people. You don't need some people to do this. You don't ask that there's someone in the house? I think, Your Honor, there's no – the first – if we're asking what should the first question be, I haven't seen a single case where a court said that an officer must – in presence versus presence of weapons. I'm not aware of that case. Well, I'm not trying to argue against the situation. It's a lot of compelling situations. You certainly don't want to encourage this kind of conduct because there are a lot of factual scenarios that could arise just by saying this is okay. I think, Your Honor – And some of them won't be so pretty. And I think that's why it has to be so fact-specific. And I can understand the court's concern if we had a child, if we had a mentally disabled person. Well, you've got his wife. That seems to be a pretty big deal. Well, I think here in the 21st century, Your Honor, we don't look at women as being inherently weaker than men. And after this particular woman got up and perjured herself at trial, made up a scapegoat, blamed all the defendant's crimes on a dead man, and if you want to know what she had to say about this conversation, at trial she said that when asked whether there were weapons, both she and her husband simultaneously responded no. You're trying to say – are you saying that? That, in fact, she was tough and she was big and kind of presented herself as being able to handle herself under this scenario? I'm saying it took quite a bit of gumption to stand up in the stand and perjure herself. And I think that – She said she was in fear when the officer came in. She also said that Steve Wise, a heroin addict who conveniently died a few days before the August search, was the person who possessed all those items. She said there was no gun ever pulled out from under the couch. Is this a totality of the circumstance determination? Do we look at all of the circumstances that surround this? I think that you should. And I think it's important to consider what happens if the court goes the other way and says if a suspect overhears a question being asked of somebody else, clearly of somebody else nearby, and they decide to answer, that's compulsion. Well, I guess the question is just how clear was this? And we have a limited set of facts, and we don't look at the intent of the officer. We look at how the suspect in this case understood the question and whether or not it was reasonably foreseeable as opposed to being possible. Correct. And what is it about this set of facts that warrants a distinction in your favor in this case? I think, Your Honor, had Agent Oliver come in and begun by addressing both folks, Mr. and Mrs. Bell, I've got a warrant for your house, and if he then pivoted and specifically asked Ms. Bell, are there any weapons, Ms. Bell, that's a different circumstance because he's begun the conversation by engaging others. Here, everything is pointed just towards Ms. Bell. And he's asking this question, you say, because of safety, you want to make sure. But didn't he say that the SWAT officers had already cleared the house? They had gone through. But the fact that that weapon was found. Well, let me make sure. It sounds like to me, I experienced SWAT officers, if they go through your house, there's nobody in that house. Generally speaking, that's true. That could be someone else under the boards or somewhere that the officers just didn't see in thin air. Clearly, it seems to be his testimony. His concern is not whether someone else is in that house. I think, Your Honor, that question actually goes to the second point, which is the public safety exception. He's asking whether there are weapons that could hurt an officer. Well, it goes also to your statement that the reason he questioned her was because, about the guns, they want to make sure they were safe in the house. But guns, and you said someone could have gotten it, but he's also testified the SWAT folks have cleared this house. There could be a gun that is loaded with one in the chamber that if an agent reaches in and grabs something, something happens. And, in fact, that's exactly what Agent Oliver testified, that they would be searching through the house, could be reaching in the closets, and he didn't want someone to get hurt. That's his testimony. That's what's credited by the court. So you would have to find that as clear error. And I don't think it is. I think it's eminently reasonable. You began talking about sort of a doomsday scenario, but I'm not so sure that I buy that. It seems to me that, first of all, my experience has been that Miranda, notwithstanding, most suspects, including this one, are quite willing to talk to the police. And it seems to me that a prudent officer would simply separate these individuals and take the precautions necessary to make sure that he complied with the law if we chose to go against your view of this case. I think, Your Honor, it comes down to a question of what standard the court's going to set. Because the question here isn't just about search warrants. It would apply to traffic stops. It would apply to any time multiple individuals are validly detained and only one of them is questioned. Consider, for example, a traffic stop where an officer has probable cause to believe that there's evidence of a crime in the car and so pulls the two occupants out on a busy roadside. Husband and wife. Husband and wife. Is he required to sequester the two of them by himself to create that danger to the community? Or is he required to put some earmuffs on one of them while he questions the other? You've got a whole different scenario with a car. You talk about a house, and you know the expectation of privacy, determination. Totally different. I think you've got to keep it kind of in the context of dealing with a house. You have a specific warrant to go in this house for a specific reason. You've got a husband and wife. You believe the husband is the one dealing with it. You have nothing on the wife, even though subsequently you've indicated all these things that she did. But when you're looking at this, the next case doesn't come by with someone who's going to say something bad on the stand or say other things. And you've got a whole situation where Grandma's in the house, and you put her right beside her grandson. I mean, why not just, if you do this, why not do that? I say this is okay. I think, Your Honor, that's where a court can issue a specific holding, and that's why Fourth Amendment cases like this. If we try to give rules where we can at least give you some clearly established law so the next time it comes up we can deal with it more meaningfully and plus help the officers. And that's one of the beauties of Miranda is the fact that, you know, given it, if you just give it, as I understand from the police officer's perspective, that's a good thing. They don't have to go through the question, was it voluntary? Did you do all this other stuff? I gave you one. And it sort of makes it nice and clear. It makes their job easier rather than getting this mushy thing of, oh, I can put someone beside each other, husband and wife, grandma, cousin, sister, or maybe a child. I don't know. It just makes it messy. I think, Your Honor, the reality is no Fourth Circuit case, no Supreme Court case requires the provision of a Miranda before questioning folks. It does. You're right. If the officer had given Miranda here, that there would be a different set of circumstances. There would be no claim. But here the particular question asked of someone else, the fact that this defendant decided on his own to come in, that's not foreseeable. Was it possible? Of course, because it happened. It's possible. What was the foreseeable result of this agent's question? The foreseeable result was that the person he was talking to, the person he introduced himself to, the homeowner, the person who's not a felon, that person, he believed, reasonably so, would be likely to respond. I suppose, but for that little admonition you had not to talk to, the defendant would have followed the procedure simply doing what Judge Diaz says and Mirandized. But that happened here because you were told, they had been told, don't ask. I can't speak to exactly what would have happened had that agreement not been in place. But it does create the need to do what was done here. He can't ask the defendant, or he shouldn't or whatever, because he's been told not to. That's what you told me. And so Judge Diaz's situation of asking the defendant or Mirandizing, that option just wasn't available to this officer. He's got to do something different. He certainly could have Mirandized both of them and simply not asked the defendant any questions. I don't think that would have been an issue. They were pretty crafty in doing it. They took it away. I don't know, Your Honor, that there's any evidence of him attempting crafty. In fact, the factual findings are the exact opposite, the exact opposite, that he was credibly asking those questions for safety. Was he required to put the defendant next to his wife? He was not required to, although I think that it is common practice, and perhaps Your Honors have seen this, during a search warrant to secure persons in one common place so that we don't have people divided around. So being in the same room is very common. Well, that's all well and good if you don't have that prohibition to not talk to the defendant. But when you do it in this context here, it sort of gives it kind of an air that maybe it was a little crafty. You know you can't talk to the defendant, so I'm going to look at the wife sitting right next to her and ask her. All I can say, Your Honor, is that… And if he says something, I'm not going to say, you've not been Mirandized. If he doesn't do that, well, let him talk. He's in the room. I think, Your Honor, that maybe you come to this position with some first principles views about how certain officers act. What I can tell you is that in this case, this officer was found credible by Judge Gerard Hazel, George Gerard Hazel. I challenge the credibility of the officer in challenging the techniques that were used here in the question of whether Miranda should have been involved with the defendant. I'm not saying that any officer could have done this. I'm not saying there's anything wrong this officer did in that way. Looked at it and just said, well, you know, I'm told not to talk to him. She's sitting right here. Let me just talk to her. I think, Your Honor, he's speaking, as he said, with the homeowner because he knew she was the homeowner. He's asking her for officer safety. That's his testimony credited by the court. That's why he's asking the question. That's why he's asking her. There's no evidence of him being crafty. The whole officer safety thing seems to be precluded by the Mobley case. You've got two people handcuffed. You've swept the house clean. There's not a whole lot of officer safety that Mobley allows you to use in that case even for the exception that you mentioned here. I think Mobley is certainly a strong case for the other side. Granted, I think U.S. v. Young provides some distinguishing factors. For example, we have here in this case multiple persons. We've got a situation where we have reason to believe there's a firearm. There's that belief that there could be a loaded gun someplace. That's different as opposed to an offhand, hey, any guns here. I think there is a way that this court can reasonably get, as Judge Hazel did, to the public safety exception. But I think our best argument. You've got to really reach to get that public safety, say with two people handcuffed and you said you swept the house clean. If you do that, then that's basically you're just saying the fact that a gun can be in there creates an exception. It doesn't matter because it can go off. I don't think it's just. You don't have any. You don't need the exception. You're always going to have a public safety. If there's a threat of a gun, you don't need that safety because the gun itself creates the safety problem. I think you're on the other factors that have been not recognized by this circuit but by others, as we pointed out, are the fact that this particular defendant had a history of violent crime. And certainly he's handcuffed, so perhaps that mitigates it somewhat. Not mitigated unless he can break Houdini and get out of the handcuff. He's not going anywhere. You've got a SWAT team in there. Your Honor, with respect, two minutes and 50 seconds. I'd like to move to the next piece. I think I understand the point of position. So the volunteer statements, I think our best argument, and the one we've led with Judge Hazel's chief holding, this was not custodial interrogation. There's no coercive police practice here that Miranda was designed to set up. Are you going to address the sentencing? Yes, Your Honor. As to the question of whether or not these issues had to be pled and proven, we'll rest on our papers. Alamondura's Taurus remains the law of the land, so there was no need to plead, prove the prior convictions for the ACCA or 924C. We'll leave it at that. USB bullet, this Court's made it clear that is the law of the land. As with concerning the Maryland robbery with a deadly weapon circumstance, it is a distinct crime. Mathis, Apprendi, make that abundantly clear. Elements are those things which must be found in order to sustain a conviction. That's what an element is under Mathis. And here, robbery with a deadly weapon requires that a robbery be committed with the use of a dangerous or deadly weapon. True, there have been some state courts that have labeled that as a sentence enhancement. It's part of one single offense. They've always, in Maryland, they've always sent that to the jury, and the pattern in jury instructions require the jury to find that as a fact. Indeed, Your Honor. However. Which one of the states have labeled it as a sentencing enhancement? I'm sorry? Maryland, one of them? What's that, Your Honor? Which state has labeled it as a sentencing type enhancement? So that's Maryland does. It calls it that. That's the label. But the case was actually muddled because in Bynum v. State, another decision from the state's highest court, in the same paragraph, it states the defendant was charged with both Maryland robbery and robbery with a deadly weapon. So two separate crimes. And states that the offense of robbery with a deadly weapon requires proof of an additional element. Haggins v. State notes that for some purposes, these two crimes are regarded as separate offenses. Can assault with a deadly weapon be based on reckless conduct alone? So if we need to get there, Your Honor, I think the answer is yes, it may. So that's the question of whether the defendant is a career offender, whether it is D.C., assault with a deadly weapon conviction can count. And the answer is yes. With all due respect to the judges who issued the concurring opinion in Middleton, first on its substance, the government submits it was incorrect. Second, as a matter of precedent, it is not binding, need not, and ought not be followed here. And I'll also note the two statutes we have at issue, that involuntary manslaughter statute and assault with a deadly weapon are very different. And it matters for two reasons. One, the elements are so distinct. And second, Middleton concerned ACCA. And a big piece of its reasoning for why use means something different in ACCA does not exist in the guidelines context. Can robbery with a deadly weapon be committed by threatening property? Absolutely not. Giles and Douglas are dicta. They have never once been cited by any other court for that proposition. Where do they come from? Where do those cases come from, those Maryland cases? They are stray dicta from 1970. And I can point the court. You think there's no case? Do you say there's no case that this court has ever looked at and used dicta to be able to form a basis for this? And if we found such, then would you take it that dicta can be used? I think dicta can be used to inform an opinion. However, in this case, that stray. I'm talking about in this specific situation. You think there's been any case in this circuit in which the court has looked at a case similar to like Giles where you had, they call it dicta, and used it. Would that inform the way we should decide this case if such a case exists? If there's a case in which the court says dicta can help us to understand the law, that can help to inform it. But the question is. Then we should follow that. There's precedent. If we have a court case that says that, we should follow it. If we do. I think, Your Honor, what's more important to look at is the fact that there's different cases saying different things. Do you think that there is such a case? No, Your Honor. I'm not trying to dance around it. I guess my basic response is that Giles and Douglas, they weren't even cases about property. Their case is about legitimate assaults. One, a threatened assault, tell her, give me your money. The other, a question of whether an actual physical assault, a tussle, as it was described. Is that what you do? Do you go right on and look at the specific things that happened here? Or do you look at it and determine whether or not the statute can do this? No, I think you look at whether the statute can. And more recently, if we're going to look at it. So does it matter what actually was done? If the statute, in fact, allows it to be charged in this matter, that is that threatening of property would be sufficient. If that was the case, wouldn't that inform as to whether, at least the way the case law is going? If that were the case. But it's not. And if the court wants to look at more recent cases, concerning a specific issue where it was actually on point. Hunt, 2016, Maryland, App, Lexis, 327. Quote, it is the threat to the person that makes robbery a crime of violence. Williams, 102, 8-3rd, 8-14, Maryland, Court of Special Appeals, 2014. Described robbery as, quote, crime against a person. First offender was convicted in 19 what? 85 and 86. So shouldn't we look at the law that existed then? Absolutely, Your Honor. And if we look at how Maryland cases define what robbery is, it is a compound larceny. A compound larceny. Meaning it is a case in which you have the taking or carrying away of someone's property by either assault or a threatened assault or battery. You don't batter someone's car. You batter a person. You don't assault someone's house. You assault a person. This has, this crime always has been and remains a crime against persons. That's the finding of the Third Circuit. It's the finding of the D.C. Circuit. And it ought to be the finding here as well. All right. I'm well over time. My apologies. I think you've gone through your red light. All right, Mr. Hudson. Turning first to the Miranda issue. Even accepting all of Agent Oliver's testimony, it's clear that when this question is asked, are there any weapons in the house, any spouse's instinct, either a husband or a wife, is to lead their spouse out of the situation. Mrs. Bell testified that she was afraid when the SWAT team comes in. And it's reasonably foreseeable that her spouse would respond to the question, which again was not verbally addressed to Mrs. Bell, with an answer. It was reasonably likely. I thought it was. I thought the testimony and the factual finding was that he came into the room and walked in with a couple of feet of Mrs. Bell and established eye contact with her and he said he selected her because she was the homeowner and the warrant was issued for the home. And he said they have a warrant to search the home and he said, for officer safety, are there any weapons? And before she could answer, he was still looking at her. Before she could answer, Mr. Bell popped in and said, yeah, under the couch. That's all correct, Your Honor, and we don't challenge any of that. Okay. So my point is, in those circumstances, the court finds that Mr. Bell was not interrogated. Under these factual scenarios that you have posited, it seems to me we would have to take each case as it's presented. And in this case, it looks to me like there was a concerted effort by Officer Oliver to make sure he questioned her as the homeowner. They did not intend to interrogate Mr. Bell and he went and talked to her. And apparently, I don't think their chairs were right beside each other. One was to the right and behind the other. That's what I saw in the testimony. I was looking. There was a photograph that marked the location. That's not in the record, is it? Yes, that photograph is in the record. Do you know where that is by any chance? It's in the government supplemental appendix. Oh, it's in the supplemental. It's in the supplemental. We did not include it in the original appendix. And I'd like to point out to Judge Diaz's question, there are things that the government could have done if they wanted to ask this question. The government could have Mirandized both Mr. and Mrs. Bell. They could have separated them. The question is whether what was done here violated Miranda. That's the question. And the idea that there's numerous possibilities is irrelevant. The question is he came into the room and he walked over to Stacy and looked her in the eye, established contact, and as we related, and he said, I was talking to her. And the judge said he was talking to her. Now, there is this doctrine that Judge Wynn's questions have brought out, which could raise some problems. The question is whether that's a problem here. And apparently the district court found facts that doesn't allow that type of finding in this case. But that's why we're here and we're arguing the case. That's right, Your Honor. Let me make sure that's absolutely correct. I don't think this officer could Mirandize this defendant. From what I understand, he wasn't supposed to ask the defendant any questions. That's right. So that's not on the table for him to do that. Although he could have Mirandized the defendant and not asked him any questions, that's true. And that's right, Your Honor. The statements at the hearing were that there was an agreement, without any indication as to whom it was with, that Mr. Bell not be questioned. And to respond to what the government said about traffic stops, traffic stops are not usually custodial. The Supreme Court has said that. It said it in Berkmer v. McCarthy. And so that situation is entirely irrelevant here. With respect to Maryland robbery, I'd like to underscore that even if the government's right that Maryland robbery with a deadly weapon is a distinct crime, Giles and Douglas nevertheless still take the crime outside of the ACCA. Just ignore that dictum down there. Two different cases. Your Honor, Aparicio Soraya squarely answers this question. Sitting on Bach, this Court said we still use, even if something goes beyond the whole. So you're telling me there's a case in this circuit? Precisely, Your Honor. A case in which we've said just that, that dictum can be used? Absolutely, Your Honor. And not only that. What's the name of that case? Aparicio Soraya on Bach. And not only that. In Aparicio Soraya, this Court said that there doesn't need to be, the defendant doesn't need to be able to point to a specific case showing, a state case, showing the state law being applied to the circumstances he says the state law can apply to. All that's required is a statement from a state appellate court saying that state law extends to those circumstances. That's what Aparicio Soraya says. Under Aparicio Soraya, Giles and Douglas take Maryland robbery or Maryland robbery with a deadly weapon outside of the ACCA. Thank you. Thank you.
judges: Paul V. Niemeyer, James A Wynn Jr., Albert Diaz